RENDERED: MARCH 17, 2016
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$

2014-SC-000386-MR

RONALD LYNN CRAFT      APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.      HONORABLE CHARLES LOUIS CUNNINGHAM, JR., JUDGE
NO. 11-CR-000007

COMMONWEALTH OF KENTUCKY      APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**AFFIRMING**

A circuit court jury convicted Ronald Lynn Craft on one count of intentional murder and one count of being a first-degree persistent felony offender (PFO). The jury fixed punishment at twenty years' imprisonment, and the trial court entered judgment accordingly. Craft now appeals that judgment to this Court as a matter of right[1], raising two issues for our review: (1) that Kentucky Revised Statutes (KRS) 29A.020(2)(b) unconstitutionally delegates to the judiciary the power to establish the number of peremptory challenges awarded to the Commonwealth and (2) he was entitled to a directed verdict on the intentional-homicide charge. Because we hold Craft's arguments have no merit, we affirm the trial court's judgment.

---

[1] Ky.Const. § 110(2)(b).

## I. FACTUAL AND PROCEDURAL BACKGROUND.

On Christmas Eve night 2010, Craft stabbed Leonard Dixon in the chest. The wound was six inches deep. Dixon died within hours.

Earlier that night, Tywan Hinkle began his shift as a liquor store cashier. When he began, he saw several intoxicated men congregated in the store lobby. Hinkle was familiar with Craft, whom he knew by the nickname "Smacky." He did not know Dixon but later identified him as among the men gathered in the store. Hinkle later told police that Craft looked agitated that evening, while the unknown man (later to be identified as Dixon) appeared happy. Nevertheless, Hinkle ordered the group of men out of the store.

As the crowd left, Hinkle could see Craft and Dixon arguing in the area outside the store. He was not able to hear what the argument was about, nor could he discern why they were arguing. Soon, Hinkle observed law enforcement officers arriving at the gas station across the street. Apparently Dixon had been stabbed in the chest and staggered into the station, gushing blood, before collapsing in front of the deli case. Dixon was nearly dead when the paramedics arrived at the scene, and he ultimately succumbed to his wounds at the hospital shortly thereafter. A medical examiner would later determine that Dixon suffered a single six-inch deep stab wound to the chest. The cut damaged his heart and caused significant blood loss, which was the ultimate cause of his death.

The blood trail from the station back to the liquor store led the police back to Hinkle. The police used Hinkle's observations to form the basis for a

search warrant of Craft's house. Upon executing the warrant, investigators found a bloody knife—eleven inches long with about a six-and-a-quarter inch blade—in a drawer in his bedroom. The blood on the knife's blade would later be confirmed to match Dixon's DNA.

That night, the police interviewed Craft. He initially, denied even being at the liquor store. He then volunteered the statement, "I ain't killed nobody." Craft eventually admitted to being at the liquor store, but repeatedly denied any involvement in Dixon's murder. Days later, a grand jury indicted him on one count of murder, one count of tampering with physical evidence, and one count of being a first-degree PFO.

At trial, Craft's attorney began her opening statement by admitting that Craft had indeed stabbed and killed Dixon. But she then asserted Craft did so in self-defense. Craft also called one witness, Allen Simpson, to testify that he had seen a man walking toward the liquor store carrying a large stick. Simpson could not offer a description of the man's appearance, clothing, or anything that could link the man to Dixon. Hinkle later testified that he did not see Dixon with a stick that night.

The jury found Craft guilty of murder, but not guilty of tampering with physical evidence, and sentenced him to twenty years' imprisonment. The jury also found him guilty of first-degree PFO and enhanced the sentence to twenty-five years. Craft later filed a motion under Kentucky Rules of Civil Procedure (CR) 59.05, seeking to set aside the enhanced twenty-five year sentence because a murder conviction is not subject to PFO enhancement. The trial

3

court granted the motion and entered an amended final judgment sentencing Craft to twenty years' imprisonment.

Craft presents two issues for our review. First, he contends that trial court discretion with regard to peremptory jury challenges is an impermissible delegation of legislative authority under Kentucky's strong separation of governmental powers principle. And second, he contends the Commonwealth adduced insufficient evidence to support a conviction for murder and Craft was entitled to a directed verdict on the charge. Because we reject his arguments, we affirm Craft's conviction and the trial court's judgment.

## II. ANALYSIS.

### A. Notice of Constitutional Challenge of Statute was Inadequate.

Craft's first claim of error contends that the trial court erred by granting the Commonwealth nine peremptory challenges. Under his understanding of Kentucky law, he believes the Commonwealth is not entitled to any. This issue was unpreserved at the trial court level, and Craft accordingly asks us to review his claim for palpable error under Kentucky Rules of Criminal Procedure (RCr) 10.26.[2] At the heart of his claim is the assertion that the discretion given to trial courts in setting the appropriate number of prosecutorial peremptory jury challenges runs afoul of the separation of powers principles enshrined in our state constitution.

---

[2] "A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

4

Section 116 of the Kentucky Constitution declares that this Court alone is the final arbiter of our rules of "practice and procedure."[3] We exercised this function to set a baseline number of peremptory challenges in RCr 9.40. The General Assembly recognizes this authority through KRS 29A.290(2)(b), which also declares that the number of prosecutorial peremptory challenges is set by this Court.[4] Essentially, Craft questions whether such a clear rulemaking mandate exists with respect to prosecutorial peremptory challenges. He positions this type of trial procedure as one of legislative creation; a privilege non-existent in the common law and totally dependent on legislative will. Under this view, KRS 29A.290 is an unconstitutional delegation of legislative authority to the judiciary, and accordingly, RCr 9.40 is an encroachment by the Court on powers reserved to the General Assembly alone.[5] But because Craft failed to comply with the appropriate procedures in raising an appeal based on the constitutionality of a statute, we decline review.

KRS 418.075 declares that notice to the Attorney General is prerequisite to any constitutional challenge.[6] It is this Court's practice to require strict

---

[3] *See also Glenn v. Commonwealth*, 436 S.W.3d 186, 188 (Ky. 2014).

[4] "The number of peremptory challenges shall be prescribed by the Supreme Court." We have previously reviewed the constitutionality of this statute in light of RCr 9.40 and determined it unconstitutional. But out of comity to our sister branch of government and because the statute is not inconsistent with our rules, we nonetheless refused to invalidate it. *See Glenn*, supra. *See also Commonwealth v. Reneer*, 734 S.W.2d 794, 797 (Ky. 1987).

[5] *See* Ky.Const. § 28 ("No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.").

[6] "In any proceeding which involves the validity of a statute, the Attorney General of the state shall, before judgment is entered, be served with a copy of the

compliance with this statutorily mandated notification.[7] And we have also held that this notification cannot be satisfied by simply filing an appellate brief.[8] In the present case, Craft admittedly did not notify the Attorney General of his intent to challenge the statute's constitutionality. Instead, he asks us to depart from our firm rule of ironclad adherence to KRS 418.075.

On behalf of his argument, Craft invokes our ruling in *Glenn v. Commonwealth* as a departure from our usual policy.[9] Indeed, in *Glenn* we allowed exception to the notification requirements for an appeal challenging the constitutionality of RCr 9.40—a remarkably similar issue to the one presented today. Justice Cunningham's opinion in that case recognized that challenges to RCr 9.40 and KRS 29A.290 are often tethered together as part of a larger claim. But Glenn's appeal focused solely on our Court-created rule of procedure. On those grounds, Justice Cunningham wisely concluded that application of our strict compliance with the notification statute would create a "comity of errors that would unjustly deprive the petitioner of appellate review."[10] So we allowed

---

petition, and shall be entitled to be heard, and if the ordinance or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the petition and be entitled to be heard." *Id.* at KRS 418.075(1).

[7] *See Benet v. Commonwealth*, 253 S.W.3d 528, 532 (Ky. 2008) ("[S]trict compliance with the notification provisions of KRS 418.075 is mandatory...even in criminal cases[.]"). *See also Grider v. Commonwealth*, 404 S.W.3d 859, 861 (Ky. 2013) (applying KRS 418.075 to bar review of the validity of RCr 9.40 when argued in conjunction with the constitutionality of KRS 29A.290(2)(b)).

[8] *Id.*

[9] *Glenn*, 436 S.W.3d at 188.

[10] *Id.*

6

exception for an appeal based solely on the validity of our own rules. We were silent with respect to constitutional challenges rooted in statute.

Craft's appeal does not include such a luxury. While questioning the validity of RCr 9.40, to be sure, he also unabashedly calls into question the legitimacy of KRS 29A.290. We do not question his accusation of the statute's unconstitutionality; we are on record noting that this statute is an invasion of the judicial prerogative that is preserved solely on notions of comity with the legislature. But nonetheless, Craft's appeal is rooted, at least in part, on the statute's legitimacy. Because Craft failed to comply with KRS 418.075, we must decline to address the merits of his argument.

Challenges to prosecutorial peremptory strikes have continued to surface despite a host of consistent statements from this Court on the issue. This determined effort again evokes visions of Justice Scalia's ghoul that "repeatedly sits up in its grave and shuffles about, after being repeatedly killed and buried."[11] We hope today's decision finally clarifies this Court's position and adequately entombs this ghoul once and for all.

### B. Craft Was Not Entitled to a Direct Verdict.

For Craft's second claim of error, he alleges the evidence supporting his murder charge was so insufficient that he was entitled to directed verdict. He specifically contends that the lack of eyewitness testimony makes a determinative understanding of his mental state at the time of the killing

---

[11] *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., dissenting). *See also White v. Commonwealth*, 2015 WL 1544230, *3 (Ky. April 12, 2015).

7

impossible. Craft's attorney readily admitted that Craft stabbed and killed Dixon. But without testimony as to how the stabbing occurred, Craft posits that there is no way to establish whether he acted with the requisite mental state to support a conviction for intentional or wanton murder beyond a reasonable doubt. We disagree.

To be sure, it is a constitutional maxim that the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[12] Craft's attorney asserted this principle when moving the trial court for a directed verdict. The motion was twice denied. Our standard of review for denial of a directed verdict is whether, under the evidence as a whole, it would be clearly unreasonable for the jury to find guilt.[13] And in conducting this analysis, we construe all evidence below in a light most favorable to the Commonwealth.[14]

The Kentucky Penal Code designates two ways an accused may be convicted of murder. The first is when a person acts with "intent to cause the death of another person, and he causes the death of such person" absent the existence of an extreme emotional disturbance for which there is a reasonable explanation.[15] The second occurs when a person "wantonly engages in conduct

---

[12]*In re Winship*, 397 U.S. 358, 364 (1970).

[13] *See Commonwealth v. Fletcher*, 59 S.W.3d 920, 921 (Ky. 2001).

[14] *See Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009); *see also Commonwealth v. Sawhill*, 660 S.W.3d 3, 4 (Ky. 1983).

[15] KRS 507.020(1)(a).

8

which creates a grave risk of death to another person and thereby causes the death of another person."[16] So our law recognizes two mental states connecting the caused-death of another to murder: intent and wantonness. To be entitled to a directed verdict, Craft must show us that no reasonable jury may conclude he acted under either state of mind beyond a reasonable doubt.

The Code further defines precisely what amounts to intentional conduct. To support a criminal conviction in the Commonwealth, a person acts with intent "when his conscious objective is to cause that result or to engage in that conduct."[17] This mirrors the definition included in jury instructions. So under this classification of murder, the jury must conclude that Craft acted with the objective of causing Dixon's death.

Alternatively, the Code declares that a person acts wantonly "when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists."[18] Further, "the risk must be of such nature and degree that disregard thereof constitutes a *gross deviation* from the standard of conduct that a reasonable person would observe in the situation."[19] This is an admittedly robust definition, and the jury instructions were more lay-friendly than the penal code. The jury in this case was instructed that Craft may be guilty of murder if he wantonly engaged in

---

[16] KRS 507.020(1)(b).

[17] KRS 501.020(1).

[18] KRS 501.020(3).

[19] *Id.* (emphasis added).

9

conduct that created a "grave risk of death" and he caused Dixon's death under "circumstances manifesting extreme indifference to human life."

It is Craft's argument today that because no one actually saw him kill Dixon, there is no way to determine his mental state at the time of the killing. But as the Commonwealth thoroughly reminds us, we have always allowed intent to be inferred from the act itself and surrounding circumstances.[20] Also, this Court has long held that "because a person is presumed to intend the logical and probable consequences of his conduct, a person's state of mind may be inferred from his actions preceding and following the charged offense."[21] And finally, we have held that "intent to kill can be inferred from the extent and character of a victim's injuries."[22]

With that firmly in mind, we cannot see how it would be clearly unreasonable for a jury to conclude Craft acted intentionally or wantonly in causing Dixon's death. Craft admitted to stabbing Dixon with a blade over six inches long. The spat between Craft and Dixon was well-documented. The wound was six inches deep. This wound is more than enough for a jury reasonably to conclude that Craft was acting in a manner that created the grave risk of death to Dixon and that the conduct amounted to an extreme indifference to human life. The only possible exculpation in this instance is if Craft acted in self-defense—an argument presented to and rejected by the jury.

---

[20] *See Mills v. Commonwealth*, 996 S.W.2d 473 (Ky. 1999). *See also Paulley v. Commonwealth*, 323 S.W.3d 715, 725 (Ky. 2010) (intent may be reasonable inferred).

[21] *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002) (external citations omitted).

[22] *Hudson v. Commonwealth*, 979 S.W.2d 106, 110 (Ky. 1998).

Either way, under the totality of the circumstances surrounding Dixon's death, we cannot say no reasonable jury could have convicted Craft of murder.

### III. CONCLUSION.

For the reasons articulated above, we affirm the trial court's judgment.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Daniel T. Goyette
Louisville Metro Public Defender of Counsel
Office of the Louisville Metro Public Defender

Cicely Jaracz Lambert
Assistant Appellate Defender
Office of the Louisville Metro Public Defender

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Micah Brandon Roberts
Assistant Attorney General